# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| | : | Hon. Katherine S. Hayden |
| v. | : | |
| | : | Criminal No. 18-47 (KSH) |
| DAVID ALVEY | : | |

---

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(I) AND FOR HOME CONFINEMENT

---

CRAIG CARPENITO
UNITED STATES ATTORNEY
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Brief:
NICOLE F. MASTROPIERI
Assistant U.S. Attorney

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES.................................................................................................ii

PRELIMINARY STATEMENT......................................................................................... 1

BACKGROUND.................................................................................................................. 2

I.   Alvey's Criminal Conduct .................................................................................... 2

II.  Alvey's Guilty Plea and Sentence........................................................................ 4

III. Alvey's Medical Condition.................................................................................... 5

IV.  Alvey's Request for a Sentence Reduction ........................................................ 7

V.   BOP's Response to the COVID-19 Pandemic................................................... 8

VI.  Conditions at USP Lewisburg in Pennsylvania ................................................ 13

LEGAL FRAMEWORK ................................................................................................... 14

ARGUMENT...................................................................................................................... 16

I.   Alvey Has Not Established "Extraordinary and Compelling Reasons"
     Warranting a Sentence Reduction...................................................................... 16

II.  The § 3553(a) Factors Strongly Weigh Against Alvey's Release........................ 22

III. This Court Has No Authority to Direct BOP to Place the Defendant in
     Home Confinement.............................................................................................. 24

CONCLUSION .................................................................................................................. 26

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*McKune v. Lile*,
   536 U.S. 24 (2002) ...................................................................................... 25

*Meachum v. Fano*,
   427 U.S. 215 (1976) .................................................................................... 26

*Moore v. United States Att'y Gen.*,
   473 F.2d 1375 (5th Cir. 1973) .................................................................... 25

*Sandin v. Conner*,
   515 U.S. 472 (1995) .................................................................................... 26

*United States v. Brady*,
   No. 18-CR.-316 (PAC), 2020 WL 2512100 (S.D.N.Y. May 15, 2020) ...................... 24

*United States v. Carver*,
   No. 19-CR-06044-SMJ, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020) ................... 18

*United States v. Chambliss*,
   948 F.3d 691 (5th Cir. 2020) ...................................................................... 22

*United States v. Coles*,
   No. 18-CR-20254, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) ........................ 18

*United States v. Desage*,
   No.13-CR-00039, 2020 WL 1904584 (D. Nev. Apr. 17, 2020) ............................... 21

*United States v. DiMartino*,
   No.14-CR-175(AWT), 2020 WL 2307648 (D. Conn. May 8, 2020) ........................ 24

*United States v. Eberhart*,
   Crim. No. 13-313, 2020 WL 1450745 (N.D. Cal. March 25, 2020) ........................ 18

*United States v. Farchione*,
   No. 17-CR-628 (JPO), 2020 WL 2319291 (S.D.N.Y. May 11, 2020) ...................... 24

*United States v. Fry*,
   Crim. No. 11-141(4) (PAM/KMM), 2020 WL 1923218 (D. Minn. Apr. 21, 2020) . 21

*United States v. Gamble*,
    No. 18-CR-0022-4(VLB), 2020 WL 1955338 (D. Conn. Apr. 23, 2020) .................. 21

*United States v. Garcia*,
    606 F.3d 209 (5th Cir. 2010) ....................................................................... 26

*United States v. Green*,
    764 F.3d 1352 (11th Cir. 2014) ................................................................... 14

*United States v. Haney*,
    No. 19-CR-541, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) .................................. 18

*United States v. Jones*,
    836 F.3d 896 (8th Cir. 2016) ....................................................................... 14

*United States v. Korn*,
    No. 11-CR-384S, 2020 WL 1808213 (W.D.N.Y. Apr. 9, 2020) ................................. 18

*United States v. Mack*,
    No. 19-CR-27 (PGG), 2020 WL 2489163 (S.D.N.Y. May 14, 2020) ........................ 24

*United States v. Okpala*,
    No. 17-CR-00533, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020) ............................. 18

*United States v. Pinto-Thomaz*,
    No. 18-CR-579 (JSR), 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) ........................ 18

*United States v. Raia*,
    954 F.3d 594 (3d Cir. 2020) ....................................................................... 18

*United States v. Seymon*,
    No. 11-CR-10040-JES, 2020 WL 2468762 (C.D. Ill. May 13, 2020) ........................ 24

*United States v. Shah*,
    No. 16-20457, 2020 WL 1934930 (E.D. Mich. Apr. 22, 2020) ................................. 21

*United States v. Voda*,
    994 F.2d 149 (5th Cir. 1993) ....................................................................... 25

*United States v. Weeks*,
    No. 16-CR-167, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020) ................................. 18

*United States v. Wright*,
    No. 17-CR-695 (CM), 2020 WL 1922371 (S.D.N.Y. Apr. 20, 2020) .................. 21, 22

<u>S**TATUTES**</u>

18 U.S.C. § 1349 ................................................................................................................ 4

18 U.S.C. § 3142(g) ......................................................................................................... 14

18 U.S.C. § 3553(a) ..................................................................................................... *passim*

18 U.S.C. § 3553(a)(2)(A) ............................................................................................. 24

18 U.S.C. § 3553(a)(2)(B) ............................................................................................. 23

18 U.S.C. § 3553(a)(2)(C) ............................................................................................. 23

18 U.S.C. § 3582 ............................................................................................................. 26

18 U.S.C. § 3582(c) .................................................................................. 14, 17, 22, 26

18 U.S.C. § 3582(c)(1)(A) ........................................................................................ *passim*

18 U.S.C. § 3582(c)(1)(A)(i) ......................................................................................... 14

18 U.S.C. § 3583(d) ....................................................................................................... 26

18 U.S.C. § 3583(e)(2) ................................................................................................... 27

18 U.S.C. § 3621 ............................................................................................................. 11

18 U.S.C. § 3621(b) ....................................................................................................... 25

18 U.S.C. § 3624(c)(2) ................................................................................................... 11

34 U.S.C. § 60541(g) ..................................................................................................... 11

<u>P**UBLIC** L**AWS**</u>

Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136,
134 Stat. 281(2020) .................................................................................................. 11

First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018) ............................ 14

<u>S**ENTENCING** G**UIDELINES**</u>

U.S.S.G. § 1B1.13 ................................................................... 14, 15, 17, 19

U.S.S.G. § 5F1.2 ............................................................................................... 26, 27

## O<small>THER</small> A<small>UTHORITIES</small>

Federal Bureau of Prisons, COVID-19 Home Confinement Information, at
https://www.bop.gov/coronavirus/ (last accessed on May 27, 2020) ......................... 12

Federal Bureau of Prisons, Health Services Division, Pandemic Influenza Plan-Module
1: Surveillance and Infection Control (Oct. 2012), available at
https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. .................................... 8

Federal Bureau of Prisons, Updates to BOP COVID-19 Action Plan: Inmate
Movement (Mar. 19, 2020),
https://www.bop.gov/resources/news/20200319_covid19_update.jsp. .................. 8, 9

## PRELIMINARY STATEMENT

Defendant David Alvey ("Alvey") was sentenced by this Court to 60 months' imprisonment for leading a massive scheme to defraud programs related to the Post-9/11 GI Bill. He now asks this Court to reduce his prison sentence under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release to home confinement, relying in part on the threat posed by the COVID-19 pandemic. The Court should deny the motion.

Alvey seeks compassionate release because he has certain health conditions (specifically, asthma and diabetes) identified by the CDC as placing him at a higher risk for an adverse outcome should he contract COVID-19. While the presence of these two health conditions in the larger context of the pandemic could present the type of extraordinary and compelling circumstances favoring compassionate release, they do not do so here for multiple reasons. First, Alvey's asthma, diabetes, and other health conditions all are well-controlled and effectively being treated by the medical staff at United States Penitentiary in Lewisburg, Pennsylvania ("USP Lewisburg"), where Alvey is housed. Second, multiple courts presented with compassionate release motions by inmates with worse health circumstances than Alvey have denied them. Third, BOP has taken effective steps to limit the transmission of COVID-19 at its facilities as demonstrated by the fact that there have been zero cases of COVID-19 among the USP Lewisburg inmate population. Fourth, with full knowledge of his medical circumstances, BOP already has denied Alvey's requests for compassionate release and home confinement.

Finally, the § 3553(a) factors—which must be considered when assessing a § 3582(c)(1)(A) motion—do not support a sentence reduction for Alvey. Alvey was the leader of an extremely serious offense that not only defrauded the Department of Veterans Affairs out of more than $24,000,000, but also victimized veterans. Alvey has not served even half the sentence that this Court imposed (and which Alvey bargained for pursuant to his Rule 11(c)(1)(C) plea agreement). The nature and circumstances of his offense, the need for just punishment, and the goals of general and specific deterrence all strongly favor that Alvey continue to serve the sentence originally imposed by this Court.

This Court also should deny Alvey's alternative request for an order directing the Federal Bureau of Prisons ("BOP") to transfer him to home confinement because it lacks the power to do so.

## BACKGROUND

### I.    Alvey's Criminal Conduct

From approximately 2009 through August 2013, Alvey conspired to fraudulently obtain over $24 million dollars in tuition assistance and other education-related benefits from the Post-9/11 GI Bill, a federal education benefits program designed to help veterans who served in the armed forces following the terrorist attacks on September 11, 2011. The Post-9/11 GI Bill provides educational assistance to eligible veterans of the U.S. Armed Forces by paying for veterans' tuition, housing costs, and other educational expenses as long as their courses meet certain criteria.

2

Alvey worked with the associate dean at Caldwell University to get approval from Caldwell's administration to develop and administer a series of non-credit online courses for veterans in Caldwell's name.  In order for the courses to be eligible for education benefits under the Post- 9/11 GI bill, Alvey and others prepared and submitted an application to the Veterans Administration stating that the courses were developed, taught, and administered by Caldwell faculty and met Caldwell's stringent educational standards.  The courses were subsequently approved, and Alvey and others aggressively marketed the courses to veterans who were eligible to receive the benefits.

Caldwell, however, did not participate in developing or teaching the online courses.  The veterans were instead enrolled in the online correspondence courses developed and administered by a subcontractor retained by Alvey and his company, Ed4Mil.  Neither Ed4Mil nor its subcontractor were disclosed to the government, and neither were eligible to receive Post-9/11 GI Bill benefits.

Alvey concealed the true nature of the courses from the government and the veterans who enrolled in the courses.  Thousands of veterans enrolled in the online courses believing they were taking courses from Caldwell. The scheme caused the Veterans Administration to pay more than $24 million in tuition benefits under the Post-9/11 GI Bill.

## II.     Alvey's Guilty Plea and Sentence

On February 1, 2018, Alvey pled guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. Docket Entry ("DE") 25. On June 4, 2018, this Court sentenced Alvey to 60 months' imprisonment pursuant to a Rule 11(c)(1)(C) plea agreement between Alvey and the Government. DE 31. This sentence was below the 78 to 97 months' imprisonment recommended by the advisory U.S. Sentencing Guidelines. *See* Presentence Investigation Report attached as Government Exhibit ("Gov. Ex.") A (under seal) at ¶ 133. The Court further imposed a three year term of supervised release and ordered Alvey to pay $24,024,465.65 in restitution. DE 31. Alvey has served approximately 22 months of that sentence (or approximately 37 percent). Contrary to Alvey's assertion, he is not eligible for release 5 months from now. *See* Def. Mot. at 10. His earliest possible release date is October 10, 2021 – about 17 months from now – if he successfully completes the Residential Drug Abuse Program ("RDAP"), to which he was admitted due to his history of substance abuse, and if good conduct time is not disallowed for misconduct. *See* Declaration of Jonathan Kerr, the Supervisory Attorney for the facilities that include USP Lewisburg, dated May 28, 2020 at ¶ 4 attached as Gov. Ex. B. Without the RDAP program, his projected release date with good-time credit is October 10, 2022. *Id.* If he does not complete the RDAP program, and he loses his good conduct time, his release date will be July 7, 2023. *Id.*

### III.   Alvey's Medical Condition

Alvey seeks compassionate release because he is in a "high risk" category during the current COVID-19 pandemic based on his history of asthma, heart problems, and diabetic condition.  BOP's records appear to indicate that BOP has managed each of Alvey's medical conditions throughout his time at USP Lewisburg, including prescribing medication to manage his diabetes, blood pressure, and cholesterol and making adjustments as needed.  *See* Alvey's BOP Medical Records, attached as Gov. Ex. C (under seal) at 36-37.

BOP has regularly monitored Alvey's diabetic condition, and prescribed and administered medication to Alvey that has helped keep his A1c level well-controlled. Over the past year, Alvey's A1c level has ranged between a pre-diabetic level of 6.3% and 6.7%, which is well under the target goal of 7% recommended by the American Diabetes Association. *See* Gov. Ex. C at 3 (December 18, 2019 Clinical Encounter report, stating "recent A1c was 6.3, which is stable over the last year, on only metformin"); *see also* Gov. Ex. C at 42 (noting diabetes is an A1c level > 6.4%).

Alvey's asthma also appears to be well-controlled.  According to the BOP medical reports, Alvey claims that he has only exhibited asthma symptoms in recent years when he has had viral infections.  The BOP medical staff has prescribed an Abuterol inhaler for Alvey to use as needed, which he has elected not to use.  *See* DE 37 at Attachment #1 (Patient Education Assessment & Topics report, dated May 17, 2019, "claims only symptoms in recent years have been with viral infections;

5

[d]eclinedPRN albuterol"); *Id.* at 13 (June 25, 2019 Clinical Encounter report stating, "[g]ot a lower resp infection a few weeks ago, but said he thinks it kicked up his asthma with which he hasn't had a problem in years.  The tight breathing lasted only a day and resolved after a night's sleep.  Says nothing he felt the need for medical attention for and he declines a PRN albuterol inhaler today.").

Although Alvey's motion indicates a history of heart problems, there is no indication in the BOP medical records that this is an existing condition that would subject him to heightened sensitivity to COVID-19.  USP Lewisburg has managed Alvey's blood pressure with medication and made adjustments as needed.  The BOP medical reports indicated that Alvey's "usual" blood pressure range is "<130's/85ish." Gov. Ex. C at 4.  According to the medical reports, his blood pressure had increased to a higher range of 140s to 150s in or about December 2019 due to a pain and anti-inflammatory medication that Alvey was taking for shoulder pain, and his blood pressure was expected to revert back to under 130/85 when he stopped taking the medication. *Id.* at 3-4.  On March 31, 2020, the date of Alvey's last examination, his blood pressure results had dropped to 126/78, and was no longer within the hypertension range of 100-120/60-80.  Gov. Ex. C at 1.  Thus, as demonstrated by Alvey's medical records, his blood pressure was controlled as of the date of his last examination. The medical staff at USP Lewisburg continues to carefully monitor and treat all of Alvey's medical conditions.

6

## IV.   Alvey's Request for a Sentence Reduction

On or about April 15, 2020, Alvey filed with the BOP a request for compassionate release under 18 U.S.C. § 3582(c)(1)(A) due to the onset of COVID-19 in the United States. Gov. Ex. B at ¶ 2.  Prior to BOP rendering a decision, he sought the same relief from this Court. DE 34. On May 6, 2020, BOP denied Alvey's request. Memorandum from J. Dressler dated April 29, 2020, attached as Gov. Ex. D; Gov. Ex. B at ¶ 2.  On April 30, 2020, Alvey filed a *pro se* motion with this Court seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A) on the ground that he suffers or has suffered from diabetes, asthma, and a heart condition, making him more vulnerable to serious complications from COVID-19.[1]  DE 34.  Alvey supplemented his filing on May 12, 2020 (DE 37), May 14, 2020 (DE 38); and May 19, 2020 (DE 39).

Alvey's supplemental submission included BOP's "Summary Reentry Plan – Progress Report," dated April 13, 2020, in which a referral was made for Alvey's extended home confinement "for being medically at-risk if exposed to COVID-19." DE 37.   The home confinement referral was subsequently denied by the BOP Residential Reentry manager on or about April 24, 2020 because Alvey failed to meet the time-served thresholds.  Gov. Ex. B at ¶ 3.  For consideration of home

---

[1] Alvey file his motion on April 30, 2020, before the 30-day exhaustion window had expired, because he had filed his request for a reduction of sentence with BOP on or about April 15, 2020. Alvey filed a supplemental submission on May 19, 2020, noting that the 30-day window had subsequently passed on May 14, 2020.

confinement transfers, BOP requires inmates to have served at least 50% of their sentence, or have 18 months or less remaining on their sentence *and* have served at least 25% of their sentence. *Id.* As noted above, Alvey meets neither criteria.

## V.   BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at

https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

8

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control (CDC), including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan (the "Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas

9

when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended until at least May 28, 2020, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened

for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the BOP, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10 percent of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion,

11

beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has transferred 3,311 inmates to home confinement. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information, at* https://www.bop.gov/coronavirus/ (last accessed on May 27, 2020).

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates

12

once released (at a time that the Probation Office has necessarily cut back on home

visits and supervision).

## VI.    Conditions at USP Lewisburg in Pennsylvania

The USP Lewisburg facility has taken extraordinary measures to protect

inmates and staff during this pandemic.  Those steps are consistent with what BOP

has outlined.  *See generally* Gov. Ex. B.  Their extraordinary measures have produced

extraordinary results.  Currently there are no COVID-19 cases at the USP Lewisburg

main institution or adjacent satellite camp.  *Id.* ¶ 30.  The BOP website lists "1" staff

case, however, that USP Lewisburg employee was on temporary duty assignment to a

New York facility and quarantined off-site upon return.  *Id.*  The staff member has

not been to USP Lewisburg since April 12, 2020, when the staff left on the temporary

duty assignment.  *Id.* In addition, no inmate or staff at the institution has exhibited

any symptom warranting COVID testing.  *Id.* ¶ 31.

Ultimately, the BOP is best positioned to determine the proper treatment of

the inmate population as a whole, taking into account both individual considerations

based on an inmate's background and medical history, and more general

considerations regarding the conditions and needs at particular facilities.  In this case,

USP Lewisburg has met this challenge and kept their confirmed COVID-19 infection

rate to zero within their facility. Moreover, while at Lewisburg, Alvey has received all

the medical treatments he has needed to manage his diabetes, blood pressure,

cholesterol, and asthma.

13

## LEGAL FRAMEWORK

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. A court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction"; (ii) "the defendant is not a danger to the safety of any other person or to the community as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13. [2]

---

[2] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of  the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover. USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

## ARGUMENT

The Court should deny Alvey's motion with prejudice.  While conditions like asthma and diabetes could constitute "extraordinary and compelling reasons" supporting a sentence reduction in light of the COVID-19 pandemic (even though they ordinarily would not), Alvey's particular health circumstances do not merit that relief. This is particularly so in light of decisions by this and other courts to deny compassionate release to inmates with circumstances equally as or even more serious than Alvey's.  Moreover, the precautions taken by BOP at USP Lewisburg have adequately addressed the risks of the spread of COVID-19 at that facility.  Separately, this Court should deny Alvey a sentence reduction because Alvey has not shown that it is warranted in light of the relevant § 3553(a) factors.  In addition, this Court lacks statutory authority to grant Alvey's alternative request to direct BOP to transfer him to home confinement.

## I.   Alvey Has Not Established "Extraordinary and Compelling Reasons" Warranting a Sentence Reduction

Alvey's request for a sentence reduction should be denied because he has not demonstrated that "extraordinary and compelling reasons" warrant his release. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The

Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Eberhart*, Crim.

17

No. 13-313, 2020 WL 1450745, at *2 (N.D. Cal. March 25, 2020) ("[A] reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A)."). [3] To classify COVID-19 as an extraordinary and compelling reason would be inconsistent with the text of the statute and the policy statement. Moreover, Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a worldwide viral pandemic.

That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under § 3582(c)(1)(A). If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition may satisfy the standard of "extraordinary and compelling reasons." Under these circumstances, a chronic condition (*i.e.*, one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would

---

[3] *See also, e.g., United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19. USSG § 1B1.13, cmt. n.1(A)(ii)(I).

Here, Alvey has two conditions, asthma and diabetes, identified by the CDC as placing him at a higher risk for a serious illness should he contract COVID-19. The presence of these two risk factors could, in conjunction with the unique circumstances posed by the COVID-19 pandemic, qualify as the kind of "extraordinary and compelling reasons" that would satisfy the policy statement. But they do not do so here.

Merely reciting several diagnoses without more hardly suffices to evince a "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." U.S.S.G. § 1B1.13, cmt. n.1(A). Here, BOP's medical records indicate that Alvey's conditions are being managed. The medical staff at USP Lewisburg has monitored and effectively treated each of Alvey's medical conditions and Alvey has not argued otherwise. For example, USP Lewisburg has provided adequate care, including regularly monitoring and prescribing medication, to help keep Alvey's A1c level under the American Diabetes Association's specified target goal of 7%, as well as help control his blood pressure and cholesterol levels. Gov. Ex. C. at 36 and 42. Also, while Alvey claims that he has only exhibited asthma symptoms in recent years when he has had viral infections, he does have a prescription for an albuterol inhaler to use as needed but he has elected not to use it. Gov. Ex. C at 36. BOP is well-equipped to continue to address Alvey's underlying health condition. Moreover, knowing all of

Alvey's health conditions, BOP denied Alvey's requests for a sentence reduction and release to home confinement.

Courts in this district and around the country have denied compassionate release requests in circumstances similar or far more precarious than Alvey's, including where the inmate suffers from a risk factor identified by the CDC. *See, e.g.*, *United States v. Dfouni*, Crim. No. 18-28, DE 55 (D.N.J. May 19, 2020) (Hayden, J.) (denying sentence reduction motion by inmate at USP Lewisburg with hypertension); *United States v. Thomas*, Mag. No. 19-3211, DE 297 (D.N.J. Apr. 29, 2020) (Waldor, J.)(denying motion for pre-trial release where defendant had diabetes, high blood pressure, asthma, and mental health concerns); *United States v. Sellers*, Crim. No. 10-434, DE 93 (D.N.J. Apr. 25, 2020) (Bumb, J.) (denying motion for compassionate release where defendant had diabetes); *United States v. Wilson*, Crim. No. 20-006 (KM), DE 21 (D.N.J. Apr. 23, 2020) (Kiel, J.) (denying motion for pre-trial release where 58 year old defendant had diabetes, history of prostate cancer, high blood pressure, high cholesterol, and gout); *United States v. Fisher*, Mag. No. 20-2008, DE 18 (D.N.J. Apr. 23, 2020) (Schneider, J) (denying motion for compassionate release where 62 year old defendant had Type 2 diabetes, hypertension and high cholesterol); *United States v. Salcedo*, Crim. No. 19-561 (RMB), DE 30 (D.N.J. Apr. 14, 2020) (Schneider, J.) (denying motion for pre-sentence release where defendant had diabetes and asthma); *United States v. Perez*, Crim. No. 20-099 (RMB), DE 35 (D.N.J. Apr. 14. 2020) (Schneider, J.) (denying motion for pre-sentence release where defendant had diabetes

and hypertension); *see also United States v. Gamble*, 2020 WL 1955338 (D. Conn. Apr. 23, 2020) (denied inmate with diabetes); *United States v. Shah*, 2020 WL 1934930 (E.D. Mich. Apr. 22, 2020) (denying motion where defendant suffers from diabetes and hypertension); *United States v. Fry*, 2020 WL 1923218 (D. Minn. Apr. 21, 2020) (denied for 66-year-old man who is obese and has heart disease and high blood pressure); *United States v. Desage*, 2020 WL 1904584 (D. Nev. Apr. 17, 2020) (relief denied for inmate at the outset of 36-month sentence, given his criminal record; while he is diabetic, he will be isolated and BOP is endeavoring to keep inmates safe); *United States v. Wright*, 2020 WL 1922371, at *3 (S.D.N.Y. Apr. 20, 2020) (McMahon, C.J.) (denied for 35-year-old who has diabetes; it appears "the BOP has been successful at limiting the spread of the virus within the MCC. That result is possibly explained by the fact that, despite the close proximity of inmates, the BOP is able to impose restrictions on visitors and restrictions on internal movements that are more difficult to impose outside prison walls. There is no reason to believe at this juncture that Wright would be at any less of a risk from contracting COVID-19 if he were to be released.").  This lengthy line of cases demonstrates that, notwithstanding Alvey's risk factors, he falls short of demonstrating that there are "extraordinary and compelling reasons" that warrant his release.

 For the reasons set forth below, Alvey has failed to establish that a sentence reduction is warranted under § 3582(c) factors and his motion should be denied.

## II.    The § 3553(a) Factors Strongly Weigh Against Alvey's Release.

Alvey's request for a sentence reduction should also be denied because the § 3553(a) factors, which this Court must consider as part of its analysis, strongly weigh against his release. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

Alvey's crime was serious. As described above, Alvey conceived and led a massive fraud scheme that caused millions in loss to programs funded by the Post-9/11 GI Bill.  He thought up how to solicit Caldwell University to participate in a bogus online education programs targeting veterans so that he could get the federal dollars meant for their benefit.  Alvey orchestrated the scheme and recruited others to it.  Over the course of several years, Alvey and his co-conspirators bilked the VA's education benefit program of tens of millions of dollars.  If the magnitude of Alvey's fraud was egregious, his choice of victims was more so.  He preyed on the Veteran's Administration and the thousands of veterans who sought benefits from programs designed to help them. Alvey harmed each one of the victims he enrolled in unapproved online correspondence courses without their knowledge, causing the VA to pay over $24 million for fraudulent courses. Alvey's conduct was egregious and preyed upon a federal benefit program designed to help some of America's most service-oriented individuals. Nothing about his conduct merits any leniency now.

Further, the need for deterrence weighs heavily against releasing Alvey early. *See* 18 U.S.C. § 3553(a)(2)(B); 18 U.S.C. § 3553(a)(2)(C).  To date, Alvey has only served

approximately 37 percent (22 months of his 60 month sentence) of the original

sentence imposed by this Court in 2018.  That sentence was part of a Rule 11(c)(1)(C)

plea agreement between Alvey and the Government in which both sides agreed that

was the appropriate sentence. The sentence represented a break from the

imprisonment range called for by the advisory U.S. Sentencing Guidelines (78 to 97

months). Gov. Ex. A at ¶ 133.  Alvey bargained for that sentence and should now

serve it to completion. Alvey's sentence should remain intact, to continue to punish

him for his conduct and to deter others by showing that defrauding the VA's

education benefit program out of millions of dollars results in significant and

meaningful penalties.

It does not promote the interests of sentencing to reduce the sentence and

release an inmate, like Alvey, who has served a small portion of his five year sentence.

Court have generally denied release in circumstances where the inmate has served

only a portion of a long sentence, even where the inmate suffers from a CDC risk

factor.  Courts, upon balancing all considerations, deem it appropriate to defer to

BOP's judgment regarding whether any further steps are necessary to protect the

inmate. *See, e.g.*, *United States v. DiMartino*, 2020 WL 2307648 (D. Conn. May 8, 2020)

(defendant at Canaan is 66 and has heart disease and diabetes, but has served only

35% of 709 month sentence for long-running tax evasion); *United States v. Seymon*,

2020 WL 2468762, at *4 (C.D. Ill. May 13, 2020) (has diabetes, but has served only 9

years of 25-year drug sentence); *United States v. Mack*, 2020 WL 2489163 (S.D.N.Y.

May 14, 2020) (26-year-old inmate has diabetes, severe obesity, and hypertension, but 10 months served so far on below-guideline 30-month drug sentence is insufficient); *United States v. Brady*, 2020 WL 2512100 (S.D.N.Y. May 15, 2020) (court will not give "windfall" and reduce 36-month drug sentence after 8 months; will reevaluate if situation at prison changes); *United States v. Farchione*, 2020 WL 2319291 (S.D.N.Y. May 11, 2020) (denied for 67-year old Devens inmate suffering from heart disease and hypertension because only served one year of 84-month fraud sentence).  Alvey fails to demonstrate how release, approximately 22 months into a 5-year sentence for a serious crime, reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense). *See* 18 U.S.C. § 3553(a)(2)(A).

In sum, given the seriousness of Alvey's offense and the fact that he has not yet served even half of his sentence, it is not in the interests of justice to grant his request under the § 3553(a) factors.  Accordingly, in light of Alvey's offense and the totality of relevant circumstances, this Court should deny the motion for a sentence reduction.

## III.   This Court Has No Authority to Direct BOP to Place the Defendant in Home Confinement.

Alvey has also asked that this Court order BOP to place him on home confinement. That request should be denied because this Court has no authority to direct BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to BOP's discretion.

Once a sentence is imposed, BOP is solely responsible for determining an inmate's place of incarceration. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993). Because Alvey's request for home confinement alters only the place of incarceration, not the actual term of incarceration, only BOP may grant or deny her request.

Moreover, there is no constitutional or statutory authority that allows the Court to order home confinement. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). Following the imposition of sentence, the Court has limited jurisdiction to correct or modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (per curiam). Section 3582(c) contemplates only a reduction in sentence. *See* § 3582(c). But Alvey's request to serve the rest of his term in home confinement, as

25

opposed to prison, works no reduction to his sentence. Home confinement merely permits the inmate to serve out his term of imprisonment at home. Alvey's request for such relief therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post- conviction. Because § 3582(c) deprives the Court of jurisdiction to grant home confinement and because Alvey offers no other statutory authority to support his request for such relief, this Court has no authority to act on his request for such relief in this forum.[4]

## CONCLUSION

For these reasons, this Court should deny Defendant's motion for a sentence reduction and for home confinement.

Respectfully submitted,

CRAIG CARPENITO
UNITED STATES ATTORNEY

/s/ Nicole F. Mastropieri
Nicole F. Mastropieri
Assistant United States Attorney

---

[4] If a court grants a sentence reduction, it may "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." § 3582(c)(1)(A). In imposing a term of supervised release, the court may impose a period of home confinement as a condition of supervised release, provided that the court finds that home confinement is a "substitute for imprisonment." USSG § 5F1.2; see 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with USSG § 5F1.2. See § 3583(e)(2).